**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Parkview Adventist Medical Center,** | ) | Chapter 11 |
| | ) | Case No. 15-20442 |
| **Debtor.** | ) | |

**MOTION FOR AUTHORITY TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(B), FED. R. BANKR. P. 4001(b) AND D. ME. LBR 4001-2 AND OBTAIN CREDIT PURSUANT TO 11 U.S.C. § 364(d), FED. R. BANKR. P. 4001 AND LOCAL BANKRUPTCY RULE 4001-3, AND FOR OTHER RELIEF**

Parkview Adventist Medical Center, the above-captioned debtor and debtor-in-possession in these Chapter 11 proceedings (the "Debtor" or "Parkview"), by and through its undersigned counsel, hereby moves for authority to use cash collateral (or cash, accounts receivable, and proceeds thereof claimed to be cash collateral) pursuant to 11 U.S.C. § 363(c)(2)(B), Fed. R. Bankr. P. 4001(b) and D. Me. LBR 4001, and for authority to obtain credit pursuant to 11 U.S.C. § 364(d), Fed. R. Bankr. P. 4001 and D. Me. LBR 4001-3 and for other relief and, in support thereof, states as follows:

### Jurisdiction, Venue and Statutory Basis

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(b) and 1409(a), and Rule 83.6(a) of the Local Rules of the United States District Court for the District of Maine, pursuant to which all cases filed in Maine under Title 11 are automatically referred to this Court. This is a core proceeding; the Court has jurisdiction to enter a final order on this Motion pursuant to 28 U.S.C. § 157(b)(2)(A).

### Background

2. On June 16, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as

debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* (the "Code"). No trustee or examiner has been appointed in the Debtor's Chapter 11 case (the "Case"), and no official committee has been appointed or designated.

3. The Debtor is a non-profit, faith-based community hospital located in Brunswick, Maine, affiliated with the Seventh Day Adventist Church. Its mission is to support physical, emotional and spiritual wellness of its patients. As a result of the filing, the Debtor is now a debtor-in-possession with authority to operate its business pursuant to Sections 1107 and 1108 of the Code.

4. The Debtor currently provides a number of different types of in-patient and out-patient medical services, including (i) cardiopulmonary services, (ii) perioperative services, (iii) emergency services, (iv) laboratory services, (v) intensive care services, and (vi) medical/surgical services. The Debtor, either directly or indirectly, also offers primary care and specialty practice medical care in a number of areas, including cardiology, pediatrics, family health, and oncology and hematology services. The Debtor's primary business operations have consisted of owning and operating a 55-bed hospital. Reference is made to the Debtor's *Emergency* Motion For Approval Of Transition Of Certain Health Care And Related Services And For Other Relief (the "Transition Motion") filed contemporaneously herewith, for a description of changes proposed to be made by the Debtor in the nature of its operations.

5. The Debtor is the sole owner of Parkview Management Services Organization ("PMSO"), Parkview Professional Building ("PPPB"), Parkview Medical Arts Building Unit Owners Association ("PMAB"), Parkview Medical Realty Corp. ("PMRC") and Parkview AMC Energy, LLC ("PAMCE" and collectively with PMSO, PPPB, PMAB and PMRC the "Affiliates"). PMSO is a for-profit entity that provided physician billing services to the Debtor;

2

PPPB and PMAB are for-profit business entities relating to condominium units (office space) currently or formerly owned by the Debtor; PMRC is a Maine for-profit entity that owns the fee interest in the real estate that the Parkview Medical Arts Building is located on; and PAMCE is a Maine limited liability company that was formed to participate in an energy power pool. None of the Affiliates are debtors in proceedings under the Code.

### General Allegations

6. Prior to, on and after the Petition Date, the Debtor operated and continues to operate Parkview Hospital in Brunswick, Maine (the "Hospital") and provides health care services related thereto. Mid Coast Hospital ("Mid Coast") also operates a hospital in Brunswick, Maine, and provides health care services which are complementary to those provided by the Debtor. The Debtor has determined that the satisfaction of its mission and in order to best serve patients in the Brunswick and surrounding communities, operations of the Hospital should be transitioned, as described in the Transition Motion, and ultimately, combined with Mid Coast operations.

7. Accordingly, prior to the Petition Date, the Debtor began discussions with Mid Coast, which discussions resulted in the execution and delivery of a Term Sheet on May 29, 2015 which anticipates execution of an assets purchase agreement in short order (the "Mid Coast Agreement") (a copy of the Mid Coast Agreement will be made available to parties in interest upon request and execution of an appropriate confidentiality agreement). Closing on a sale of the Mid Coast Agreement is subject to approval of this Court. Importantly, the Mid Coast Agreement contemplates continued operations at the Hospital as well as a substantial investment in the Hospital campus, and allows for continuation of the Debtor's spiritual and wellness mission.

8. In order for the Debtor to continue in operations during its transition and pending its combination with Mid Coast, which is a condition to the Mid Coast Agreement, and thereby to fulfill its health care mission and maximize the value of its assets and business for the benefit of secured, priority, and unsecured creditors, as well as the community, the Debtor needs to assure sufficient working capital to meet payroll for medical and administrative staff, purchase medical supplies and other necessary goods, maintain the Hospital facility in good working order, and generally to meet its ordinary and necessary business expenses arising after the Petition Date. If the Debtor is unable to continue to operate, the Debtor will be forced to liquidate all of its assets. As more particularly set forth below, the Debtor believes that in a liquidation of all of its assets, there is likely to be a substantial decrease in the net realizable value of the Debtor's assets, and a liquidation will not serve the interests of the Hospital's patients or the community.

9. During the period from the Petition Date through October 31, 2015 (the "Relevant Period"), the Debtor, in the ordinary course of its business, will receive cash revenues from its payor sources, including Medicare, MaineCare, insurance payments and private payors, provide necessary health care services to its patients, and pay its operating expenses. All of such expenditures are reasonable and necessary in order to continue the provision of appropriate health care services to the patients of the Hospital.

10. In order for the Debtor to meet its obligations during the Relevant Period, the Debtor needs to have the benefit of all of its cash, receivables, and inventory, and the proceeds thereof, all of which may (*see* below) constitute cash collateral, pursuant to 11 U.S.C. §363(c)(2)(B) (collectively hereinafter referred to as the "Cash Collateral") (*see* ¶¶ 10-12, *infra*). As such, the Debtor first seeks *interim* authority to utilize what may be determined by this Court

to be Cash Collateral during the period from the Petition Date through June 30, 2015. Second, to the extent that the Court determines that any of the Debtor's assets are in fact Cash Collateral, the Debtor seeks continuing authority to use such Cash Collateral through the balance of the Relevant Period. As set forth below, the Debtor is requesting that the Court determine at the final hearing on this Motion that none of its assets constitute Cash Collateral, as a matter of fact and law.

11. Use by the Debtor of its Cash Collateral together with the proceeds of the postpetition financing requested by this Motion (the "Postpetition Financing"), will enable the Debtor to meet its payroll for medical and administrative staff, pay for necessary medical and other supplies, and pay its ordinary and necessary operating expenses, all toward the end that the Debtor will be able to continue in operation, continue providing services to its patients and the community, and thereby preserve and enhance the going concern value of its Hospital for the benefit of all creditors of the estate and the community which it serves.

12. The terms and conditions of the proposed Postpetition Financing are set forth in the Mid Coast Agreement, and in the proposed Revolving Line of Credit Agreement, a true and accurate copy of which is hereto as ***Exhibit A***. In summary, the proposed terms of the Postpetition Financing, are as follows (subject, of course, to Court approval):

- Mid Coast will provide the Debtor with a revolving line of credit in the amount of $2 million ($2,000,000) (the "Mid Coast LOC").

- Interest will accrue on balances outstanding on the Mid Coast LOC at the rate of prime + 1% *per annum*.

- In exchange for the Mid Coast LOC, Mid Coast shall be granted a security interest in the all of the Debtor's assets, superior to any and all other security interests in the same, including those of the Prepetition Lienors (as that term is defined below) except (a) MHEFA (as that term is defined below); and (b) all holders of first priority purchase money security interests in specific tangible personal property pursuant to 11 U.S.C. § 364(d).

5

- The amounts owed on the Mid Coast LOC, up to $1,500,000, shall be deemed part of the purchase price upon the closing of the sale contemplated by the Mid Coast Agreement, meaning that the Debtor's estate will be released from all liability for amounts due under the Mid Coast LOC, up to $1,500,000, at the closing.

- Should that sale not close, then the Mid Coast LOC shall be repaid by the Debtor on the earlier to occur of confirmation of a Plan of reorganization or the maturity date as set forth in the loan documents.

- The Postpetition Financing shall remain in place for the Relevant Period and for such additional time periods as may be agreed upon by the Debtor and Mid Coast.

13. The following entities (collectively, the "Prepetition Lienors") may claim a security interest in the Debtor's Cash Collateral:

- TD Bank N.A. ("TD");

- Central Maine Healthcare Corporation ("CMHC"); and

- Maine Health and Higher Educational Facilities Authority ("MHEFA")

The Debtor has not conceded the validity, priority or enforceability of the secured claims of the Prepetition Lienors.

14. The Debtor disputes the validity, perfection, and enforceability of the secured claims of the foregoing Prepetition Lienors on the following grounds, among others: (i) all amounts owed to TD on account of its purported lien in Cash Collateral have been paid in full and, as such, there being no outstanding indebtedness to TD, and none proposed to be incurred, TD has no lien or security interest in any cash or cash equivalents of the Debtor; (ii) neither CMHC nor MHEFA have enforceable security interests in the Debtor's Cash Collateral (or in other assets) because the underlying transactions in which security interests and liens were purported to have been granted were not properly authorized under Maine law. In particular, and without limitation, such security interests and liens were not approved by a vote of the Debtor's

members as required by 13-B M.R.S.A. § 1001 and the Articles of Incorporation of the Debtor; and (iii) neither CMHC nor MHEFA have enforceable security interests in the Debtor's accounts receivable and the proceeds thereof because they have failed to comply with applicable, anti-assignment statutes, including, without limitation, 31 U.S.C § 3727 and 41 U.S.C. § 6305.

15. As such, the Debtor respectfully requests that the Court determine, ***at the final hearing in this Motion***, that none of the Debtor's assets constitute Cash Collateral and that therefore the Debtor may utilize the same without the necessity of providing to adequate protection on a going-forward basis to any party in interest.

15. The Debtor is unable to obtain necessary credit on an unsecured basis, either as an administrative expense within the meaning of 11 U.S.C. § 503(b) or § 507(b), or solely pursuant to 11 U.S.C. §364(c), or on a secured basis, except upon the terms proposed for the Postpetition Financing and as set forth in the Mid Coast Agreement and the Mid Coast Revolving Loan Agreement. In order to have sufficient working capital to assure the continued operations of the Hospital throughout the Relevant Period, the Debtor must have authority to use Cash Collateral and obtain credit in the manner described herein.

16. Despite the Debtor's position that its cash, receivables and inventory are not Cash Collateral for the reasons set forth herein, it is nonetheless willing to proceed during the Relevant Period, and pending further order of this Court, as if those assets are subject to the security interests of TD, CMHC, and MHEFA[1]. Attached hereto as ***<u>Exhibit B</u>*** is a true and accurate copy of the Debtor's cash flow projections for the Relevant Period (the "<u>Projections</u>"). The Projections demonstrate the viability of the Debtor, the need for, and value of, the Postpetition

---

[1] The Debtor's (a) willingness to operate under the strictures of, *inter alia,* 11 U.S.C. §§ 361 and 363, during the Relevant Period; and (b) use of the term "Cash Collateral" should not be construed as a waiver of the Debtor's positions that there is no Cash Collateral and the Pre-Petition Lienors have no security interests in cash or similar assets of the Debtor.

7

Financing, the ability of the Debtor to provide the Prepetition Lienors (if any) with adequate protection for use of Cash Collateral (if any), and that the relief requested herein is in the best interests of the estate.

17. Moreover, as demonstrated by, *inter alia,* the Projections, the value of the Cash Collateral claimed to secure the Debtor's obligations to the Prepetition Lienors will be maintained and preserved and thus adequately protected. Further, the value of the property of the estate in general will be enhanced and improved by the Postpetition Financing, in that it will enable the Debtor to continue in operation, and to maximize the value of its assets, all for the benefit of the Debtor and its estate.

18. Without such Postpetition Financing and use of Cash Collateral, the Debtor will be required to cease all of its operations, and to liquidate all of its assets immediately, to the detriment of the Prepetition Lienors, the patient community, and to the estate as a whole. Continuing operations by the Debtor and its use of Cash Collateral will not adversely impact the value of the secured claims of the Prepetition Lienors in that, without limitation, (i) continued operations will preserve and enhance the going concern value of the Debtor, and will prevent the inherent and substantial loss which would be occasioned upon the immediate liquidation of the Debtor's assets, and (ii) the Debtor expects to be able to conduct its operations without impairing the value of its Cash Collateral.

19. As and for adequate protection for the Prepetition Lienors, the Debtor proposes the following: (i) to the extent that the Prepetition Lienors had, on the Petition Date, valid, duly-perfected, and enforceable security interests in some or all of the assets of the Debtor ("Prepetition Collateral"), and the Debtor does not concede at this time that any such security interests are valid, duly-perfected or enforceable, they shall continue to have valid, duly-

8

perfected, and enforceable security interests in such Prepetition Collateral and all proceeds of the same; (ii) the Prepetition Lienors shall, to the extent that the Debtor utilizes Prepetition Collateral or the proceeds of the same, have a replacement security interest, in all assets of the Debtor of the same character and description acquired by the Debtor on or after the Petition Date (the "Replacement Lien"); (iii) the Replacement Lien shall, *as to TD and CMMC only*, be subject and subordinate to the proposed security interest to be granted to Mid Coast to secure Postpetition Financing as authorized by the Court, and otherwise it shall have the same degree and extent of validity, perfection, and enforceability as the Prepetition Collateral; and (iv) the Replacement Lien shall secure any diminution of the value of the Prepetition Collateral occasioned by the Debtor's use of the Prepetition Collateral.

## Relief Requested

20.     By this Motion, the Debtor seeks authority, pursuant to 11 U.S.C. § 363(c)(2)(B), Fed. R. Bankr. P. 4001(b) and D. Me. LBR 4001-2, to use Cash Collateral through to and including October 31, 2015, and pursuant to 11 U.S.C. § 364(c) to enter into the Postpetition Financing upon the terms described above.  As such, and in exchange for use of the (purported) Cash Collateral, the Debtor proposes to continue in effect the security interests of the Prepetition Lienors to the same extent as they existed prior to the Petition Date, except that Mid Coast shall be given a first priority lien in the Debtor's assets as set forth in the attached Revolving Line of Credit Agreement that shall be superior to the security interests of all Prepetition Lienors except MHEFA.  In addition, the Debtor proposes to provide to the Prepetition Lienors with adequate protection in the form of Replacement Liens in all Cash Collateral acquired and created by the Debtor after the Petition Date, such Replacement Liens (a) to be limited in amount to the amount of Cash Collateral of the Prepetition Lienors actually utilized by the Debtor on and after the

9

Petition Date and during the Relevant Period; and (b) to be subordinate to the proposed Mid Coast priming lien in the Debtor's assets. Further, such Replacement Liens shall be limited in that they shall have the same validity, perfection, and priority as the prepetition liens of the Prepetition Lienors in and to the Cash Collateral as of the Petition Date (subject to Mid Coast's proposed priming lien).

21. As set forth above, the Debtor is also seeking a judicial determination before the expiration of the Relevant Period that its cash, receivables, and inventory are not in fact Cash Collateral. If the Court agrees, then there is no need for the Debtor to provide the Prepetition Lienors with adequate protection.

## **Argument**

A. <u>Cash Collateral</u>

22. Section 363(a) of the Bankruptcy Code provides the definition of Cash Collateral. 11 U.S.C. § 363(a). Specifically, cash collateral is defined to mean:

> . . . cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

23. Pursuant to Section 363(c) of the Bankruptcy Code, a debtor is authorized to use property of the estate in the ordinary course of business. 11 U.S.C. § 363(c)(1). This right of a debtor to use property in the ordinary course of business, however, does not extend to "cash collateral" of a debtor unless either: (i) the party with an interest in the cash collateral consents to its use; or (ii) the Court after notice and hearing authorizes its use. 11 U.S.C. §§ 363(c)(a)(A-B).

24. In order for the Court to authorize the use of cash collateral, it must be demonstrated that the interests of the creditor claiming a right in the cash collateral at issue can be "adequately protected." 11 U.S.C. § 363(e). Section 363(e) provides in pertinent part:

> Notwithstanding any other provision of this section, at any time, on the request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . .

*Id.*; *see also First National Bank of Boston v. Marine Optical, Inc. (In re Marine Optical, Inc.)*, 10 B.R. 893, 893 (1st Cir. B.A.P. 1981).

25. "The essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing of a reorganization case and the confirmation of a plan of reorganization or dismissal which the automatic stay is designed to accomplish in appropriate situations." *In re Arriens*, 25 B.R. 79, 81 (Bankr. D. Or. 1982). Courts have concluded that adequate protection exists in relation to the use of cash collateral in circumstances where the cash position of the debtor is likely to increase over the course of the bankruptcy premised on use by the debtor of such cash. *McCombs Properties VI, Ltd. v. First Texas Savings Association (In re McCombs Properties, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988).

26. As of the Petition Date, the total value of the Debtor's purported Cash Collateral is approximately $5,038,091 consisting of (a) cash on hand of approximately $1,616,431 (in the form of both collected and uncollected funds); (b) accounts receivable, net of uncollectible accounts, of approximately $2,080,154; and (c) inventory of approximately $1,341,506. The Debtor is proposing to use cash collateral through June 30, 2015 – *i.e.*, the Relevant Period – in the ordinary course of its business. As demonstrated by the Projections, Cash Collateral will

remain relatively steady during that period, declining by only $117,130, less than 3% the total Petition Date Cash Collateral.

27. Section 361 of the Bankruptcy Code outlines the methods by which a debtor can adequately protect the interests of a party in relation to use of cash collateral under Section 363. 11 U.S.C § 361. Under Section 361, one method of providing adequate protection is to provide the creditor with an additional or replacement lien in property (*i.e.*, the Replacement Liens referenced above). 11 U.S.C. § 361(2). As set forth above, the Debtor proposes to provide the Prepetition Lienors, as and for adequate protection for the use of Cash Collateral existing as of the Petition Date, Replacement Liens in all cash, accounts receivable, and other cash collateral acquired and created by the Debtor after the Petition Date, such Replacement Liens to be limited in amount to the amount of cash collateral actually utilized by the Debtor during the Relevant Period. In addition, such Replacement Liens shall have the same validity, perfection, and priority as the prepetition liens that the Prepetition Lienors had in Cash Collateral as of the Petition Date, *except that those Replacement Liens shall be subordinate to the priming lien to be given to Mid Coast as to all Prepetition Lienors except MHEFA*. As a result of the projected improvements in cash position of the Debtor as set forth in the Projections, the Replacement Liens provide the Prepetition Lienors with adequate protection.

28. Authorization of the use of Cash Collateral as requested herein is necessary in order to avoid immediate and irreparable harm to the Debtor. The inability to use cash collateral would mean that the Debtor's business operations would have to cease, causing substantial harm to the Debtor's business and assets as well as the entire community that the Debtor serves. This would cause irreparable harm not only to the Prepetition Lienors, but also to the value of the

Debtor's business, including, but not limited to, a loss of the going concern value of the Debtor's business.

29. Finally, as noted above, the Debtor does not believe that TD Bank, CMHC or MHEFA have valid, perfected or enforceable liens and security interests in the Debtor's Cash Collateral. All amounts owed to TD on account of its purported lien in Cash Collateral have been paid in full and, as such, there being no outstanding indebtedness to TD, and none proposed to be incurred. As such, TD has no lien or security interest in the Debtor's cash or cash equivalents. CMHC and MHEFA failed to comply with applicable state law regarding the proper authorization of mortgages and security interests on assets of non-profit corporations (*see* 13-B M.R.S.A. § 1001) and further failed to comply with applicable state and federal laws regarding the pledge of Medicare and Medicaid (MaineCare) accounts (*see e.g.*, 31 U.S.C § 3727 and 41 U.S.C. § 6305). As such, the Debtor proposes to provide adequate protection for the claimed security interests of these creditors in Cash Collateral subject to the foregoing reservations of rights.

B.     Postpetition Financing

30. In addition to the use of Cash Collateral as described herein, the Debtor also seeks authority to enter into the Postpetition Financing upon the terms described above.

31. Pursuant to 11 U.S.C. § 364(d), if the Debtor is unable to obtain unsecured credit allowable under §503(b)(1) as an administrative expense,

> (1) the court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal in property of the estate that is subject to a lien only if –
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

32. The Debtor has not been able to secure credit upon any terms other than those proposed herein. Accordingly, the requirements of 11 U.S.C. § 364(d)(1) have been met and the Court may authorize the Postpetition Financing upon the terms described herein, in order to avoid cessation of the Debtor's operations, and to permit the Debtor to continue in operation and thereby to maximize the value of the property of the estate.

33. For the reasons set forth above, the Prepetition Lienors do not possess valid, enforceable liens in the Debtor's cash, accounts receivable and inventory. As such, there is no need to provide them with adequate protection pursuant to § 364(d)(1)(B).

## Notice

34. Notice of this Motion has been provided by e-mail, facsimile, or overnight courier to: (a) the Office of the United States Trustee for Region 1, 537 Congress Street, Room 303, Portland, Maine 04101 (attn: Stephen Morrill); (b) the creditors holding the 20 largest unsecured claims against the Debtor (on a consolidated basis); (c) Central Maine Medical Center ("CMMC") ; (d) CMHC; (e) Mid Coast Hospital; (f) MHEFA; (g) TD Bank and (h) those parties who have formally filed requests for notice in this case pursuant to Rule 2002.

## Conclusion

For the foregoing reasons, the Debtor respectfully requests that this Court enter an order:

A. Finding that service of this Motion and the Proposed Order as set forth in above is adequate service of process under the circumstances of this case;

B. Establishing a preliminary hearing date and a final hearing date on this Motion;

C. At the preliminary hearing, authorizing the Debtor to use Cash Collateral during the Relevant Period;

D. At the final hearing, that none of the Debtor's assets constitute Cash Collateral and therefore the Debtor is not required to provide the Prepetition Lienors with adequate protection in order to use the same; and

E. At the final hearing, authorizing the Debtor to borrow funds in accordance with the Postpetition Financing described herein pursuant to 11 U.S.C. § 364(d); and

F. Granting the Debtor such other and further relief as the Court deems just and proper.

Dated:  June 16, 2015

/s/ George J. Marcus
George J. Marcus
Jennie L. Clegg
David C. Johnson
Andrew C. Helman

MARCUS, CLEGG & MISTRETTA, P.A.
One Canal Plaza, Suite 600
Portland, ME  04101
(207) 828-8000

Counsel for Parkview Adventist Medical Center