UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| **PARKVIEW ADVENTIST** | ) | Chapter 11 |
| **MEDICAL CENTER,** | ) | |
| | ) | Case No.: 15-20442 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**OPINION**

This matter is before me on Debtor Parkview Adventist Medical Center's ("Parkview") June 16, 2015 Motion For Authority to Use Cash Collateral Pursuant to 11 U.S.C. §363(c)(2)(B), Fed. R. Bankr. P. 4001(b) and D. Me. L.B.R. 4001-2 and Obtain Credit Pursuant to 11 U.S.C. §364(d), Fed. R. Bankr. P. 4001 and D. Me. L.B.R. 4001-3, and for Other Relief (Docket Entry "DE" 10) (the "Motion").  Creditor Central Maine Healthcare Corporation ("CMHC") objects to the Motion.  Based upon the parties' pleadings, stipulations, evidence produced at trial, oral arguments and recent briefing[1], I **DENY** the Motion.

**I.  JURISDICTION AND VENUE.**

The bankruptcy court has jurisdiction of this case pursuant to 28 U.S.C. §1334 and the general order of reference entered in this district pursuant to 28 U.S.C. §157(a) and D. Me. Local R. 83.6(a).  Venue here is proper pursuant to 28 U.S.C. §1408.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(1) and 157(b)(2)(D, M).

---

[1] An evidentiary hearing was held on July 27, 2015 and the most recent brief was submitted on August 4, 2015.

1

**II. FACTS.**[2]

Parkview is a Maine not-for-profit entity.

Parkview's operative articles of incorporation provide that its members have the "sole power" to approve the sale or encumbrance of all or substantially all of its assets.

Parkview's members met in February 2008 to, among other things, discuss its troubled financial condition. The minutes of that meeting reflect that the members voted to grant authority to Parkview's president, Theodore M. Lewis, to take steps for Parkview to become a subsidiary of the CMHC system.

On April 16, 2008, the Parkview Board of Directors met, and Mr. Lewis reported that the affiliation of Parkview with CMHC would take more time to effectuate, and that Parkview would be unable to sustain its operations without a cash infusion. Mr. Lewis reported that CMHC was prepared to loan Parkview $5,600,000. The Board of Directors adopted resolutions authorizing the loan transaction and the granting of mortgages and security instruments in Parkview's property to secure the loan.

On April 25, 2008, CMHC loaned Parkview $5,600,000.

The loan was memorialized by a promissory note and the loan obligations were purportedly secured by mortgage deeds and security agreements, all dated April 25, 2008. The note, the mortgages and the security agreements were executed on behalf of Parkview by Mr. Lewis.

The mortgages were recorded in the appropriate registries of deeds and the security agreements were filed in the appropriate office of the Maine Secretary of State.

---

[2] The facts are based on the stipulations of the parties (DE 207) or uncontroverted testimony presented at the July 27, 2015 hearing.

2

Some of the proceeds of the loan were used to pay pre-existing obligations of Parkview. The net proceeds of approximately $4,700,000 were deposited in Parkview's operating account.

On April 28, 2008 at the Parkview annual meeting of members, Mr. Lewis reported that Parkview borrowed money from CMHC. The members voted unanimously to accept the report. The minutes of this meeting do not reflect any concern raised by the members about the loan.

The Parkview members never specifically voted to authorize the execution of the mortgages or security agreements.

As of August 1, 2015, Parkview had no inpatients.

Parkview's actual collected receivables for the first month after the bankruptcy filing were less than one-half of the amount Parkview projected and were subject to set-offs.

The weekly shortfall between Parkview's collected receivables and its proposed operating expenses has averaged $300,000 per week post-petition will decline between now and October 31, 2015.

**III. DISCUSSION.**

Parkview makes four primary arguments in support of its Motion.[3] First, CMHC does not have valid liens or security interests in any of Parkview's assets because approval for the execution of those liens or security interests by Parkview's members was not obtained in accordance with the Maine Non-Profit Corporation Act (the "Act"). Second, CMHC's security interests could not, as a matter of law, attach to Medicare or Medicaid receivables. Third, even if CMHC possessed valid security interests in the Medicare and Medicaid receivables, they became unperfected by operation of 11 M.R.S.A. §9-1315(4). Fourth, even if CMHC's liens and security interests are valid, CMHC is adequately protected and Parkview should be able to continue to

---

[3] Although it presented other arguments, I do not find them to be persuasive.

use its cash collateral because CMHC is in a better position in this Chapter 11 with Parkview using its collateral than it would be in a state court receivership action.

For the reasons set forth below, I do not find that these arguments carry the day for Parkview.

### A. The failure of the members of Parkview to vote to authorize the execution of the mortgages and security interests does not void the security interests.

The Act provides that Maine not-for-profit corporations, like Parkview, have certain general powers, including the power to borrow money and secure their obligations by mortgaging, pledging or otherwise encumbering their assets. 13-B M.R.S.A. §202(I, J). These general powers are subject to limitations contained in the Act. One such limitation is contained in §1001, the section upon which Parkview relies for its argument that the mortgages and security interests that its President executed on its behalf are invalid. It provides:

1. **Terms and conditions.**  Sale, lease, exchange, mortgage, pledge or other disposition of all, or substantially all, the property and assets of a corporation may be made upon such terms and conditions and for such consideration, which may consist in whole or in part of money or property, real or personal, including shares of any corporation for profit, domestic or foreign, as may be authorized in the following manner.

    A. If there are members entitled to vote thereon, the board of directors shall adopt a resolution recommending such sale, lease, exchange, mortgage, pledge or other disposition and directing that it be submitted to a vote at a meeting of members entitled to vote thereon, which may be either an annual or a special meeting. Written notice stating that the purpose, or one of the purposes, of such meeting is to consider the sale, lease, exchange, mortgage, pledge or other disposition of all, or substantially all, the property and assets of the corporation must be given to each member entitled to vote at such meeting, within the time and in the manner provided by this Act for the giving of notice of meetings of members. At such meeting, the members may authorize such sale, lease, exchange, mortgage, pledge or other disposition and may fix, or may authorize the board of directors to fix, any or all of the terms and conditions thereof and the consideration to be received by the corporation thereto. Such authorization requires at least a majority of the votes that members present at such meeting or represented by proxy are entitled to cast. After such authorization by a vote of members, the board of directors, nevertheless, in its discretion, may abandon such sale, lease, exchange, mortgage,

4

>pledge or other disposition of assets, subject to the rights of 3rd parties under any contracts relating thereto, without further action or approval by members.

Parkview asserts that CMHC does not have a valid or enforceable lien on any Parkview assets because Parkview did not obtain the necessary approval of its members as mandated by §1001. This argument is defeated by §203(1) of the Act: "No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such a convenience or transfer [...]"[4]. Parkview counters that it is not asserting an *ultra vires* defense at all, but rather a defense of illegality. However, that argument is self-fulfilling: the granting of a security interest without a member vote was beyond Parkview's authority as provided by §1001 and was therefore illegal. Simply because an action may not be in accordance with the recommendations of §1001 does not create an illegality. Furthermore, it would be against public policy to allow Parkview, who claims to have committed the illegal behavior, to benefit from the assertion of the defense to the detriment of an innocent party. "The rationale behind the illegality defense is twofold. The first is romantic: 'no polluted hand shall touch the pure fountains of justice.' *Collins v. Blantern, 95 Eng.Rep.* 850, 852 (K.B.1767), *cited in* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* §22–1, at 888 & n. 14 (3d ed.1987). The second is punitive: courts will not 'lend their aid to relieve parties from the results of *their own illegal adventures*.' *Tocci v. Lembo*, 325 Mass. 707, 710, 92 N.E.2d 254 (1950) (emphasis added); *accord In re Sanborn, Inc.*, 216 B.R. 697, 700 (Bankr.D.Mass.1998) (noting

---

[4] Although there are three exceptions to §203(1) for actions taken by (1) members or directors against the non-profit corporation, (2) the non-profit corporation against its officers or directors, and (3) by the Maine Attorney General, none are applicable here. *See*, *Tomhegan Camp Owners Ass'n v. Murphy,* 754 A.2d 334, 335 (Me. 2000) ("In Maine, the defense of ultra vires in regard to a nonprofit corporation is available only under the narrowly prescribed circumstances contained in 13-B M.R.S.A. §203").

that Massachusetts courts refuse to 'relieve either party from the consequences of *his own violation of law*.') (emphasis added)." *Entertainment Publications, Inc. v. Goodman, et al.*, 67 F.Supp. 2d 15, 20 (D. Mass. 1999). Parkview has not presented any evidence or argument that illegality exists here.

Nor do I find Parkview's reliance on *Connolly v. Our Place, Inc.* persuasive. 1986 Me. Super. LEXIS 98 at *12 (Cum. Cty. Sup. Ct., April 22, 1986). Notably, in *Connolly*, members of the organization sued the not-for-profit for selling its primary asset. No third party was involved, as is the situation here. To the extent Parkview relies on *Jones v. Shreveport Lodge BPOE,* 60 So.2d 889, 891 (La. 1952), these arguments were dicta within the *Connolly* decision and are not controlling or applicable here.

My reading of §§202, 203(1), and 1001 of the Act leads me to conclude that Parkview cannot use §1001 of the Act as a sword against CMHC to invalidate its mortgages or security interests.[5]

**B. CMHC's security interests can attach to Parkview's bank accounts and a control agreement was not necessary to perfect them.**

Parkview next asserts that CMHC has no enforceable security interest in its accounts, including the Medicare and Medicaid accounts receivables which it deposits in its bank account. It argues that the relevant portions of 42 U.S.C. §1395g(c) and 42 U.S.C. §1396a(a)(32) prevent the assignment of Medicare and Medicaid payments by Parkview. While Parkview may be correct that those statutes prohibit direct payment of Medicare and Medicaid receivables to anyone but the provider, courts have held that nothing prohibits a provider, like Parkview, from

---

[5] Though I do not need to address CMHC's arguments concerning equity or apparent or actual authority, I note that the uncontroverted facts show that the Parkview members knew of the loan and the granting of security by its president but did not object.

6

assigning a general right to such receivables after they "flow through the provider."[6] I conclude this is a more accurate reading of the federal anti-assignment language and therefore CMHC had a security interest in the Medicare and Medicaid payments once they were deposited in Parkview's bank account.

I further find that the absence of any control agreement under the facts of this case does not vitiate the validity of CMHC's security interests in Parkview's accounts.

### C. CMHC's security interests in the Medicare and Medicaid receivables did not became unperfected by operation of 11 M.R.S.A. §9-1315(4).

---

[6] Even though it is not controlling, I find the logic of the Connecticut Superior Court convincing as quoted here:

"Thus, §1396a(a)(32) explicitly prohibits the direct payment of Medicaid receivables to anyone other than the health care provider. Nothing in the statute, however, prohibits a provider from assigning a general right to Medicaid receivables after they first flow through the provider.

This distinction has found consistent support among federal courts. For instance, the Fifth Circuit has held that a line of credit secured by Medicare and Medicaid cost reimbursement payments did not violate §1396a(a)(32) when those payments were "payable to the debtor" and were wire-transferred each month to the debtor's account before being applied to the debtor's loan balance. *In re Missionary Baptist Foundation of America, Inc.*, 796 F.2d 752, 756–59 (5th Cir.1986). More recently, a bankruptcy court explained that three federal anti-assignment statutes, including §1396a(a)(32), "do not prohibit health care providers from granting security interests in their receivables under federal programs. In fact, the statutes contain no prohibition whatsoever on the assignment of claims. Rather, each operates by prohibiting the governmental insurer itself from making payments under its program to anyone other than the service provider ..." *In re East Boston Neighborhood Health Center Corp.,* 242 B.R. 562, 573 (1999). Subsequently, a federal district court observed "that neither the Medicaid nor Medicare statutes expressly proscribe a provider's assignment of the general right to receive Medicare or Medicaid receivables to a non-provider." *Credit Recovery Systems, LLC v. Hieke*, 158 F.Sup.2d 689, 693 (E.D.Va.2001). The court later noted that "[t]he Medicare and Medicaid statutes and regulations make clear that an assignee of Medicare or Medicaid receivables may receive direct payment from the Government only where the assignment is established by, pursuant to, or in accordance with an order from a court of competent jurisdiction." Id. Finally, the Seventh Circuit in dicta noted that "[t]he appellants cite to no case and we have uncovered none, which interprets this [federal anti-assignment] statute to prohibit a provider's assignment of Medicare or Medicaid receivables to a non-provider. If anything, case law suggests the opposite." *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* 384 F.3d 338, 350 (7th Cir.2004).

*By Your Side Homemaker & Companion Services, LLC v. Agency of Aging of S. Cent. Connecticut, Inc.*, 55 Conn. L. Rptr. 661, 2013 WL 870251, at *6 (Super. Ct. Feb. 5, 2013)(footnotes omitted).

Mr. William Gannon, the chief financial officer of Parkview, testified that the proceeds of the account receivables, including those from Medicare and Medicaid, were deposited in the Parkview operating account, and the only funds that were segregated were those relating to the hospital gift store and development funds. Though 11 M.R.S.A. §9-1315(4) creates the risk that a secured party's perfection in a security interest will disappear after a certain time, that risk did not arise here, as Parkview granted CMHC a security interest in *all* the accounts receivables and proceeds. In this instance, CMHC was not, and is not, required to separately identify and differentiate between and among the proceeds of its receivables in order to preserve the perfection of its security.

### D. Parkview has not met its burden that CMHC is adequately protected.

11 U.S.C. §362(c)(2) prohibits Parkview from using cash collateral without CMHC's consent unless Parkview can prove that CMHC's interests are adequately protected. Parkview maintains that CMHC is adequately protected because, among other things, if CMHC attempted to exercise its pre-petition rights as a secured lender (such as foreclosure on collateral), Parkview would end up in receivership under 22 M.R.S.A. §7931 et seq., and its secured position would be worse than its present position. This argument is too tenuous. Even if Parkview established that it is a facility that is covered by this statute[7], Parkview did not prove that a receivership was likely. The only person who could request an appointment of a receiver is the commissioner (or acting commissioner) of the Maine Department of Health and Human Services. 22 M.R.S.A. §7933(2). Parkview offered no testimony that the commissioner was likely to do so. No one produced testimony or evidence that (1) the commissioner had been contacted about a receivership, (2) that the commissioner had contacted Parkview about a receivership, (3) that

---

[7] Parkview no longer has inpatients and, by its own representations, has no need for the appointment of a patient care ombudsman.

8

CMHC planned to seize collateral, or (4) that an "emergency" under the receivership statute existed. Receivership is an ultimate remedy. "It is the intent of the Legislature that receivership be a remedy of last resort when all other methods of remedy have failed or when the implementation of other remedies would be futile." 22 M.R.S.A. §7931. Given this, I do not agree that adequate protection should be evaluated through the prism of a Title 22, Chapter 1666-A receivership.

Finally, Parkview has failed to establish there was a sufficient equity cushion to further protect CMHC. Thus, I hold that Parkview failed to meet its burden that CMHC is, or would be, adequately protected.

### IV. CONCLUSION.

The Motion is DENIED and a separate order shall follow.

Dated: August 6, 2015         /s/ Peter G. Cary
                              Peter G. Cary, Judge
                              United States Bankruptcy Court
                              for the District of Maine